**ARCH CHEMICALS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 04–1421C.**

United States Court of Federal Claims.

Filed under seal March 7, 2005.

Reissued, March 18, 2005 [1].

1. This opinion was originally issued under seal. The parties have jointly proposed a few redactions, which the Court has accepted. The opinion is now released to be published, with a few minor, non-substantive corrections and with redacted material replaced in the following manner: "[XXXXXXX]."

Karen L. Manos, Howrey Simon Arnold & White, Washington, D.C., for plaintiff. Gregory S. Seador, Howrey Simon Arnold & White, Washington, D.C., of counsel.

Leslie C. Ohta, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were Peter D. Keisler, Assistant Attorney General, David M. Cohen, Director, and Jeanne E. Davidson, Deputy Director, all of Washington, D.C., for defendant. Bernard Duval, Counsel, and Kay

Bushman, Assistant Counsel, Defense Energy Support Center, of counsel.

## OPINION AND ORDER

WOLSKI, Judge.

This pre-award bid protest action is before the Court on a motion and cross-motion for judgment upon the administrative record. Plaintiff, Arch Chemicals, Inc. ("Arch"), is the incumbent producer and supplier of hydrazine for defendant United States ("Government"). Arch challenges the solicitation for a new hydrazine contract on two grounds. It argues that the Government's interpretation of the Solicitation's domestic source restriction clause is contrary to law or otherwise lacks a rational basis; and that the Solicitation's price evaluation methodology lacks a rational basis by failing to consider costs that the Government will necessarily incur if the contract is awarded to an offeror other than Arch. For the reasons that follow, plaintiff's motion is DENIED except as to one price-related factor, which the Government must include in its price evaluation, and the Government's motion is GRANTED except as to this one price factor.

## I. BACKGROUND

### A. The Solicitation

The Defense Logistics Agency, Defense Energy Support Center ("DESC"), issued Solicitation No. SP0600–03–R–0308 ("Solicitation") for the purchase of all of the federal government's hydrazine requirements for a period of up to twenty years. There are seven fuels that make up the hydrazine family of fuels; these seven fuels are made from three basic chemicals: anhydrous hydrazine, monomethylhydrazine, and unsymmetrical dimethylhydrazine. Admin. R. Tab 26, at 2; *see also* Eckart W. Schmidt, *Hydrazine and Its Derivatives* (2d. ed.2001). Three methods for the production of hydrazine fuels, with slight variation, are currently used in commercial applications. Admin. R. Tab 26, at 6. Of these three methods, the modified Raschig process is the only process capable of producing all three of the basic chemicals used in the production of hydrazine fuels. *Id.* Currently, only one manufacturer in the world, Arch Chemicals, uses the modified Raschig process to produce all three chemicals. *Id.* SNPE, a French company, also uses the modified Raschig process, but it only produces two of the three basic chemicals. *Id.*

Hydrazine was first used as a rocket propellant in the late 1950s, but hydrazine fuel was not put into major use until the advent of the Titan II missile, which was first launched in 1962. *Id.* at 3–4. Titan II missiles armed with nuclear warheads were on strategic alert for twenty-five years until the last missile was decommissioned in 1987. *Id.* A modified version of the Titan II and the Titan III were used for space launch and boosted a variety of military and civilian spacecraft into orbit. *Id.* In 1989, Titan IV was first launched to boost heavy national security spacecraft into orbit. *Id.* at 4–5. Titan IV, which is scheduled to make its last launch sometime later this year, has been the Government's biggest hydrazine user; with the end of the Titan program, the Government's hydrazine needs will drop dramatically. *Id.* However, hydrazine fuels will continue to remain important to the Government. The hydrazine required by the Solicitation will be used as a fuel in many national defense programs, including the Air Force F–16 fighter aircraft emergency power unit, the Military Strategic and Tactical Relay ("MILSTAR") communications satellite, the Defense Meteorological Satellite, and the rockets used to launch the payloads for the National Reconnaissance Office. Admin. R. Tab 13, at 1; Admin. R. Tab 26, at 5; Admin. R. Tab 30, at 1. Hydrazine is also essential for the Space Shuttle and many commercial satellite programs. Admin. R. Tab 13, at 1; Admin R. Tab 26, at 5; Admin. R. Tab 30, at 1.

The Solicitation contemplates the award of a ten-year contract followed by two five-year options. Admin. R. Tab 1, at 2. The Solicitation acknowledges that, due to insufficient demand to support more than one hydrazine production facility in the United States, the successful offeror's plant will likely be the only hydrazine production facility in the United States. *Id.* at 65. The plaintiff, Arch Chemicals, is the incumbent contractor and

operates the only hydrazine production facility in the United States, and the only hydrazine production facility in the world that manufactures the full complement of hydrazine products required by the Solicitation. Admin. R. Tab 26, at 6.

## B. The Initial Award

DESC initially issued the Solicitation on June 6, 2003, and proposals were submitted on December 15, 2003. Admin. R. Tab 1(I). In response to the initial Solicitation, three offerors submitted proposals: Arch, Space-Chem, and Chemicals, Inc.[2] Admin. R. Tab 17, at 2. On April 28, 2004, DESC issued its source selection decision memorandum giving its rationale for awarding SpaceChem the contract under the initial Solicitation. According to the memorandum, DESC determined that "[f]rom a strictly technical capability perspective, Arch and SpaceChem are equal." Admin. R. Tab 25, at 6. DESC decided to award the contract to SpaceChem, determining that "SpaceChem's lowest laid down evaluated price is approximately $[XXXXXX] less than Arch's." Id. at 8.

SpaceChem is a recently formed limited liability company, which is owned by United Paradyne Corporation. Admin. R. Tab 17, at 2. United Paradyne is a small business that has provided engineering and propellant services, as well as aerospace support services, at Vandenberg Air Force Base and the Kennedy Space Center. Id. SpaceChem and United Paradyne have never produced hydrazine or any other propellant[3] and thus, in competing for the initial solicitation, proposed teaming with SNPE, a French government-owned company, for hydrazine processing technology. Admin. R. Tab 21. SNPE was to provide all of the technical expertise

necessary for the manufacturing of hydrazine and would license to SpaceChem the technology needed for hydrazine production. Id.; Admin. R. Tab 18.

## C. The GAO Protest

After receiving the notice that the contract was to be awarded to SpaceChem, Arch protested the award to the Government Accountability Office ("GAO").[4] Arch filed a protest with the GAO on May 12, 2004, and a supplemental protest on June 7, 2004. Admin. R. Tab 30, at 2. Among the grounds that Arch raised before the GAO were, apparently, that DESC's interpretation of the Solicitation's domestic source restriction clause to allow SpaceChem to compete was unlawful, and that DESC's exclusion of plant shutdown-related costs from the Solicitation's price evaluation methodology was improper. The GAO, under its early outcome prediction process, advised DESC that it was going to sustain Arch's protest on the ground that SpaceChem's offer was late—it having been received after the date for initial offers.[5] In response, DESC informed the GAO that it planned to amend the Solicitation and conduct a new competition. Admin. R. Tab 31(a), at 1. Accordingly, the GAO dismissed Arch's protest without rendering a decision on the merits.

## D. The Re–Solicitation and Arch's Pre–Award Protest

On July 23, 2004, in Amendment 0016 to the Solicitation, DESC announced that it was "recompeting the procurement." Admin. R. Tab 1(P), at 2. Only minor changes to the initial Solicitation were made in Amendment 0016.[6] Despite Arch's GAO protest, DESC

---

2. Chemicals, Inc., a small disadvantaged business, was excluded from the competitive range. Admin. R. Tab 25, at 1.

3. United Paradyne does have experience in hydrazine distribution and service at Vandenberg Air Force Base and at the Kennedy Space Center. Admin. R. Tab 18, at 1.

4. Protests can be brought before the GAO under 31 U.S.C. §§ 3551–3556. This Court does not sit in appellate review of GAO decisions. *Cubic Applications, Inc. v. United States*, 37 Fed.Cl. 339, 343 (1997).

5. SpaceChem submitted a timely offer; however, SpaceChem sent an email to DESC informing DESC that it was having trouble obtaining financing and was withdrawing its offer. GAO determined that the email constituted a withdrawal of SpaceChem's initial offer. SpaceChem later reinstated its offer, but GAO found that, in effect, the reinstatement was a new offer and thus untimely. Admin. R. Tab 31(a), at 1.

6. Amendment 0016 made minor changes to the Solicitation, such as moving the dates back for delivery of sample hydrazine and first article delivery, editing the text of the section of the

did not change the price evaluation methodology nor its view that SpaceChem qualified as a domestic source under the Solicitation's domestic source restriction clause. Offerors were instructed to submit their new initial offers by September 9, 2004. *Id.* That date was extended to November 23, 2004, by Amendment 0020. Admin. R. Tab 1(T).

On September 8, 2004, Arch filed this pre-award bid protest. In the protest, Arch argues that the Solicitation's domestic source restriction clause is contrary to law and regulation or otherwise lacks a rational basis. Compl. ¶¶ 24–26. Additionally, Arch protests that the Solicitation's price evaluation methodology lacks a rational basis by failing to consider, as other price-related factors, the cost of requalifying a new manufacturing process design, and the plant shutdown costs for Arch's Lake Charles, Louisiana hydrazine plant that DESC is obligated to pay if Arch is not awarded the contract. Compl. ¶¶ 27–33. Along with the Complaint, Arch filed a motion for a preliminary injunction seeking to enjoin the award of the contract until the Court issued a final decision on the merits of the case. The need for a preliminary injunction was obviated through discussions between the Court and counsel for both parties. Because DESC's existing supply of hydrazine is sufficient to last until at least January 2009, DESC was able to agree to delay awarding a contract under the Solicitation in order to accommodate a briefing schedule on cross-motions for judgment on the administrative record.[7] Moreover, the parties were also able to reach agreement as to some of the changes to the price evaluation methodology sought by Arch. Amendment 0021 amended the Solicitation's price evaluation methodology to take into account the time value of money. Admin. R. Tab 1(U), at 2–3. The original price evaluation methodology would have treated as economically-equivalent an up-front, lump sum payment for facility costs and the same nominal amount of

facility costs spread over a twenty-year period. Amendment 0021 also amended the price evaluation methodology to include, as a price-related factor, the transportation costs of transporting DESC-owned hydrazine from Arch's current storage facilities to an offeror's proposed storage facility. *Id.* at 3. The issues relating to DESC's interpretation of the Solicitation's domestic source restriction clause and the exclusion of plant shutdown costs and re-qualification costs from the price evaluation methodology remain unresolved.

The Government agreed to delay awarding a contract under the Solicitation until February 28, 2005, to accommodate a briefing schedule on the cross-motions for judgment on the administrative record.[8] The Government also represented that it was in the Government's best interest to open the bids and begin the technical evaluation process during the pendency of the proceedings in this case; the Government understood in making this representation that the time and resources that the Government invested in this technical evaluation would not be considered by the Court in adopting any remedies needed in this matter. Oral argument was held on January 19, 2005. A permanent injunction was issued by order dated February 25, 2005.

## II. DISCUSSION

This Court has jurisdiction over pre-award bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub.L. No. 104–320, 110 Stat. 3870 (1996). The Tucker Act grants the Court jurisdiction over bid protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract . . . ." 28 U.S.C. § 1491(b)(1) (2000). In reviewing an agency's decision in a bid protest, this

---

Solicitation that contained instructions for proposal administration, and clarifying some of the evaluation and manufacturing qualifications requirements. *See* Admin. R. Tab 1(P).

7. *See* Admin. R. Tab 34, at 1 (DESC email describing inventories); Def.'s Statement of Facts ¶ 27.

8. This date was originally October 7, 2004; however, at the request of the Government, in conjunction with the filing of two motions for enlargement of time, the date was moved back.

Court uses the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4). Thus, a protestor must show that the agency's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) (2000). Under the ADRA, the Court "may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs." 28 U.S.C. § 1491(b)(2).

## A. The Administrative Record

In reviewing a motion for judgment on the administrative record "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973).[9] When reviewing formal agency decisions under the APA, the administrative record is a contemporaneous record compiled by the agency in the course of a formal adjudication or rulemaking proceeding. However, in the case of an informal agency decision, such as the award of a contract, the administrative record is merely "a convenient vehicle for bringing the decision of an administrative body before a reviewing agency or a court." *Tech Sys., Inc. v. United States,* 50 Fed.Cl. 216, 222 (2001); *Orion Int'l Techs. v. United States,* 60 Fed.Cl. 338, 342 (2004). In such cases, the administrative record is really something of a "fiction," as it is prepared by an agency after the decision has been made in response to questions about the validity of the decision making process. *See, e.g., Orion,* 60 Fed.Cl. at 343; *CCL Serv. Corp. v. United States,* 48 Fed.Cl. 113, 118 (2000).

A post-award bid protest concerns the award determination, and thus the record can be expected to contain the usual materials relating to the award, such as the solicitation, the offerors' submissions, the evaluation

reports, and the agency's decision. *See Gulf Group Inc. v. United States,* 61 Fed.Cl. 338, 347 (2004). Accordingly, the record will contain the materials considered by the decision maker, and the articulation of the decision. The concept of an administrative record in a *pre-award* bid protest, such as this case, is more elusive. These cases often concern questions of the appropriateness of certain terms of the solicitation, *see, e.g., Wash. State Dept. of Servs. for the Blind v. United States,* 58 Fed.Cl. 781 (2003) (whether the contract term "operation of a vending facility" required application of the Randolph–Sheppard Act); *Eagle Design & Mgmt., Inc. v. United States,* 57 Fed.Cl. 271 (2002) (whether the Contracting Officer's selection of a particular classification from the North American Industry Classification System was appropriate), and the making of these terms can be a far less formal process than the evaluation and award made under them.

The administrative record is supposed to reflect the information available to the decision maker at the time the challenged decisions were made, *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), as well as the rationale for why the agency acted as it did at the time that it did. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) ("an agency's action must be upheld, if at all, on the basis articulated by the agency itself"); *see also Lion Raisins, Inc. v. United States,* 51 Fed.Cl. 238, 244–46 (2001). Thus, the Court must focus on the timing of the decisions at issue to determine if the administrative record assembled by an agency needs to be supplemented or pared back. The challenged decisions in this case are of two types. First, there is the agency's interpretation of the domestic source restriction clause to allow SpaceChem to be eligible for the contract. Compl. ¶¶ 16–26. This determination was made during the evaluation and award of the contract in the initial competi-

---

9. The Supreme Court decisions regarding the use of administrative records in cases, like bid protests, involving informal agency actions, appear to rest on a misreading of the APA's legislative history. *Gulf Group Inc. v. United States,* 61 Fed.Cl. 338, 350 n. 25 (2004). This legislative history actually shows that Congress intended, consistent with the language of the statute, that factual issues would be tried de novo in reviewing courts whenever there was not a formal, statutory administrative hearing. *Id.*

tion. The second is the agency's decision to exclude certain costs from the price evaluation methodology. Compl. ¶¶ 27–33. This determination was initially made when the Solicitation was drafted, but was necessarily revisited when DESC issued Amendment 0016, effective July 23, 2004, to re-solicit bids. Admin. R. Tab 1(P); *see id.* Tab 31, at 3–4. Documents that pre-date or are contemporaneous with the relevant decisions may appropriately be a part of the Administrative Record. Those created after-the-fact are suspect, as courts reviewing an administrative record recognize that they must reject "post hoc rationalizations" as a basis for the agency action. *Motor Vehicle Mfrs. Ass'n.,* 463 U.S. at 50, 103 S.Ct. 2856; *see also, e.g., J.C.N. Constr. Co., Inc. v. United States,* 60 Fed.Cl. 400, 405 (2004).

The Government filed the Administrative Record on September 28, 2004. The Administrative Record consists of three volumes. Volume I contains the Solicitation and the amendments to the Solicitation. Volume II (un-protected information) and Volume III (protected information) contain materials such as Arch's existing contracts for hydrazine, excerpts from SpaceChem's proposal and teaming agreements, memoranda and emails regarding the price evaluation methodology, and statements submitted to the GAO. During the pendency of this case, the Government has moved on several occasions

to file additional documents as part of the Administrative Record.

In total, the Government has filed six motions for leave to supplement the administrative record, and three notices of the filing of additional documents as part of the administrative record, which were filed by leave of the Court. Arch has objected, at least in part, to four of the Government's motions for leave and to one of the documents filed by leave of the Court. Arch did not object to the Government's Second Motion for Leave, dated October 27, 2004, or its Fourth Motion for Leave, dated November 5, 2004; accordingly, those motions are GRANTED. However, Arch has objected to the inclusion of four documents as part of the record, on the basis that these contain post hoc rationalizations. Specifically, Arch objects to: 1) Tab 37, Contracting Officer's ("CO's") Report for the GAO,[10] filed by leave of the Court; 2) Tab 40, Memorandum for Record ("MFR") by the Source Selection Authority,[11] part of the Government's First Motion; 3) Tab 41, MFR on the Critical Items List,[12] part of the Government's Third Motion; and 4) Tab 42, MFR on Transportation Costs,[13] part of the Government's Fifth Motion. Arch also objected to three other documents that were part of the Administrative Record as originally filed; the Government did not oppose Arch's motion to strike those documents, and thus that motion to strike is GRANTED.[14]

10. Tab 37, Contracting Officers Report for the GAO, contains an excerpt from the CO's Statement of Facts and Memorandum of Law that was filed with the GAO. The excerpt gives an explanation as to why the plant shutdown costs were not included in the Solicitation's price evaluation methodology.

11. Tab 40, MFR by the Source Selection Authority, was dated October 22, 2004, over a month after Arch filed its bid protest in this Court. The MFR gives an explanation as to why re-qualification costs were not included in the Solicitation's price evaluation methodology. Specifically, it explains why the Government believes it will impossible to determine the extent and cost of any re-qualification testing.

12. Tab 41, the MFR on the Critical Items List, was dated October 26, 2004, and signed by the Source Selection Authority. The MFR explains why there is no prior documentation in the file related to this procurement with regard to

whether hydrazine is a critical component or a critical technology item, or is on the Critical Items List.

13. Tab 42, the MFR on Transportation Costs, was signed by the CO, the SSA, and the Contracting Division Chief, and dated October 29, 2004. The document was created over a month after Arch filed its bid protest in this Court. The MFR purports to explain why the costs of moving Government-owned railcars from Arch's facility to a new location, if an award is made to an offeror other than Arch, were not included in the Solicitation's price evaluation methodology.

14. The following documents originally filed as part of the Administrative Record will be stricken: Tab 27, Declaration of Sharon L. Murphy; Tab 28, Contracting Officer's Report In Support of the Award of Contract to SpaceChem; and Tab 29, Contracting Officer's Supplemental Report In Support of the Award of Contract to SpaceChem.

The Court GRANTS Arch's motion to strike the document proposed as Tab 40, the MFR by the Source Selection Authority. Accordingly, the Government's First Motion for leave is DENIED as to Tab 40.[15] The Court also GRANTS Arch's motion to strike Tab 42, MFR on Transportation Costs, and accordingly the Government's Fifth Motion for leave is DENIED as to Tab 42.[16] Both the MFR by the Source Selection Authority and the MFR on Transportation Costs were created after Arch's protest was filed in this Court and contain post hoc rationalizations as to why certain price factors were not considered as price-related factors in the price evaluation methodology. The MFR on Transportation Costs is also no longer relevant as the parties have settled their dispute as to transportation costs.

Arch's motions as to Tab 37, the Contracting Officer's Report for the GAO, and as to proposed Tab 41,[17] the MFR on "Critical Supply Item List," are DENIED. The Contracting Officer's Report was part of the Administrative Record that was before the GAO. This report is, therefore, part of "the record of a previous administrative proceeding relat[ed] to the procurement [which] may be incorporated into the administrative record." *SDS Int'l v. United States,* 48 Fed.Cl. 759, 765 (2001) (internal quotations omitted); *see also Orion,* 60 Fed.Cl. at 343 (Court takes submitted GAO record as the administrative record but rejects post hoc rationalizations contained therein). Further, the Contracting Officer's Report is incorporated by reference in the Source Selection Authority's MFR on the terms of the re-competition, which is properly part of the Administrative Record and to which Arch did not object. Admin. R. Tab 31(a), at 4 ("the extensive discussion in the CO's Report to the GAO applies"). The Source Selection Authority simply referenced the Contracting Officer's

Report rather than repeating the justification given therein. And finally, the document obviously pre-dates the decision to amend the Solicitation to allow re-competition under the same price evaluation methodology as initially proposed, and thus is not in any event a post hoc rationalization.

The document proposed as Tab 41, the MFR on the Critical Items List, was created by the Source Selection Authority after Arch filed its bid protest with this Court. That fact alone, however, does not keep the document out of an Administrative Record—it is not post hoc *documents,* but post hoc *rationalizations,* that give courts particular concern. In this case, the MFR explains why certain information that was known and considered by DESC relating to the Solicitation was not previously documented for the record. Specifically, the MFR discusses the fact that hydrazine was not on the Critical Items List referenced in 50 U.S.C. app. § 2077(b)(1)(A), and had not been identified as a critical item per that statutory provision. The fact that the subject of a procurement was *not* on a particular list or was *not* governed by a particular statute is not the sort of thing one would expect to find in contemporaneous documents. The MFR also explains that Arch had not raised these issues during the course of the procurement, for, if it had, some documentation as to these facts would have been created. A document of this nature may be added to the Administrative Record. As the Court has explained, "the record may be supplemented with ... relevant information that by its very nature would not be in an agency record ...." *Orion,* 60 Fed.Cl. at 343. This document certainly fits that description.[18]

In addition, Arch objects to the Government's motion to add to the Administrative Record an agreement between SpaceChem

---

15. The Government's First Motion for leave was filed on October 25, 2004. Tab 16(b), also included in the motion, will be added to the Administrative Record.

16. The Government's Fifth Motion for leave was filed on November 10, 2004. Tab 43, also included in the motion, will be added to the Administrative Record.

17. Tab 41 was the subject of the Government's Third Motion for leave, and accordingly the Government's Third Motion is GRANTED.

18. The Court also notes that plaintiff's counsel had acknowledged that the identity of the items on the Critical Items List is classified information, see Tr. (Jan. 19, 2005) at 126:9–12. By its very nature, it is unlikely that such information would ever be in an administrative record.

and SNPE, which SpaceChem allegedly intended to formally present to DESC on January 20, 2005, as part of its offer (proposed Tab 44). Arch objects to the addition of the agreement because it was not part of the record at the time the Contracting Officer determined that SpaceChem was a domestic source. It would, of course, be a post hoc rationalization were the Government to rely on this document in support of the challenged decision, as the document could not have been considered by the agency at the time it made this determination. Thus, the Government's Sixth Motion for Leave to Supplement the Administrative Record is DENIED.

Finally, the Government has moved to strike one of its own documents—Tab 26, Declaration of Ken Grams—from the Administrative Record, because this document was prepared and submitted by DESC in the GAO proceeding. Mr. Grams, a chemical engineer who served on DESC's technical evaluation team for the Solicitation, submitted the declaration "in support of the Contracting Officer's Bid Protest Report," and stated that the "information set forth in this declaration is based on my personal knowledge and information contained in the files and records of DESC." Admin. R. Tab 26 at 1. To say the least, it is highly unusual for the Government to seek to strike from the Administrative Record one of its own documents that it chose to include in the first place. It is all the more unusual in this case, given that this document is entirely factual, providing background information on the history, use, and production of hydrazine. According to Mr. Grams, this is information that was known to DESC, and in all likelihood it would have been taken for granted by the Government evaluators and the offerors competing under the Solicitation. Indeed, it appears that only the Court would be disadvantaged were this information to be removed from the record. As the document contains information upon which all concerned with the Solicitation tacitly relied, the document may be included as containing "rel-evant information that by its very nature would not be in an agency record," *Orion*, 60 Fed.Cl. at 343. The Government's motion to strike it is DENIED.

## B. Standard of Review

A motion under RCFC 56.1 for judgment on the administrative record differs from a motion for summary judgment under RCFC 56, as the existence of genuine issues of material fact does not preclude judgment under the former. *Compare* RCFC 56.1(a) (incorporating only the standards of RCFC 56(a)-(b)) *with* RCFC 56(c) (containing the disputed facts standard). A motion for judgment on the administrative record examines whether the administrative body, given all the disputed and undisputed facts appearing in the record, abused its discretion. *See Gulf Group Inc. v. United States*, 61 Fed.Cl. 338, 350 (2004); *Tech Systems, Inc. v. United States*, 50 Fed.Cl. 216, 222 (2001).

In a pre-award bid protest, in determining whether a decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, the Court follows the APA standard applied in the *Scanwell*[19] line of cases. *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001) ("Under the ADRA, all bid protest actions under the APA are now reviewed under the standards applied in the *Scanwell* line of cases.")(citing *RAMCOR Servs. Group, Inc., v. United States*, 185 F.3d 1286, 1290 (Fed.Cir.1999)); *see also CACI, Inc.-Fed. v. United States*, 719 F.2d 1567, 1574 (Fed.Cir.1983) (holding, prior to the ADRA, that *Scanwell* applied to pre-award bid protests). Under the APA standard, as applied in the *Scanwell* line of cases, an agency's decision may be set aside if either: 1) the procurement officials decision lacked a rational basis, or 2) the procurement procedure involved a violation of applicable statutes or regulations. *Banknote Corp. v. United States*, 365 F.3d 1345, 1351 (Fed.Cir.2004); *Impresa*, 238 F.3d at 1332; *see also Kentron Hawaii, Ltd. v. Warner*,

---

19. *Scanwell Labs., Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir.1970). The *Scanwell* line of cases arose before the ADRA brought post-award bid protests under our Court's jurisdiction. Prior to the ADRA, our Court exercised jurisdiction over pre-award bid protests under an implied contract theory. *See, e.g., W & D Ships Deck Works, Inc. v. United States*, 39 Fed.Cl. 638, 640–41 (1997).

480 F.2d 1166, 1169 (D.C.Cir.1973). As the Federal Circuit has explained:

> When a challenge is brought on the first ground, the test is "whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a 'heavy burden' of showing that the award decision has no rational basis. When a challenge is brought on the second ground, the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations."

*Banknote*, 365 F.3d at 1351 (citations omitted) (quoting *Impresa*, 238 F.3d at 1333–34).

If the plaintiff is able to prevail under this APA standard, the Court may issue a permanent injunction if the plaintiff demonstrates that: 1) it has achieved success actual success on the merits, 2) it will suffer irreparable injury if injunctive relief is not granted, 3) the harm to plaintiff if an injunction is not granted outweighs the harm to the Government if an injunction is granted, and 4) granting the injunction serves the public interest. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed.Cir.2004); *Gulf Group*, 61 Fed.Cl. at 352; *Gentex Corp. v. United States*, 58 Fed.Cl. 634, 654 (2003). No one factor is dispositive; "the weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed.Cir.1993); *Gentex Corp.*, 58 Fed.Cl. at 654.

## C. Domestic Source Restriction Clause

Arch's first ground for protest concerns DESC's interpretation of the Solicitation's domestic source restriction clause. Compl. ¶¶ 16–26. DESC interpreted the domestic source restriction clause to allow SpaceChem, a U.S. company that is teaming with a French government-owned company, to compete; indeed, DESC originally awarded the contract to SpaceChem. As SpaceChem is a Limited Liability Company formed under Mississippi law, and proposes to locate its hydrazine production facility in the United States, Admin. R. Tab 18 (Vol III) at 1–3, DESC determined that it qualified as a domestic source. *See* Admin. R. Tab 25, at 8.

Among the "IMPORTANT NOTICES TO OFFERORS" contained in the Solicitation was the notice that the Solicitation was "restricted to domestic *production* sources only," see Admin. R. Tab 1, at 2 (emphasis added). This notice cites the domestic source provision from the Defense Federal Acquisition Regulations Supplement ("DFARS"), *see id.*, which is incorporated into the Solicitation at clause I1.05(b). Admin. R. Tab 1, at 25. Neither the original Solicitation nor the DFARS appears to contain a definition of "domestic sources," but in Amendment 0002, effective July 1, 2003, DESC elaborated as follows:

> We are using the authority at [10 U.S.C. § 2304(c)(3)](A) to restrict competition to *offerors who will build a production facility in the Continental United States,* in order '...to maintain a facility, producer, manufacturer, or other supplier available for furnishing property or services in cases of a national emergency or to achieve industrial mobilization.' We believe that only a source, in other words, *a production facility, located in the Continental United States* can ensure that the Government will have reliable source during a national emergency and/or to achieve industrial mobilization, and therefore meet our needs.

Admin. R. Tab 1(B) at 3 (emphasis added).

This elaboration went on to cite the Federal Acquisition Regulation ("FAR") provision which underlies the DFARS domestic source clause, a provision which itself is derived from the Competition in Contracting Act ("CICA"). *Id.* (quoting from 48 C.F.R. § 6.302–3). The FAR provision identified by DESC in support of the restriction on competition allows such restriction when "necessary" to "[c]reate or maintain the required domestic capability for production of critical supplies by limiting competition to items manufactured in [t]he United States or its outlying areas." 48 C.F.R. § 6.302–3(b)(1)(v); *see also* Admin. R. Tab 1(B) at 3. In an appendix to Amendment 0003 to the Solicitation, DESC reiterated, "Source is defined as *the actual production facility.* IAW the Domestic Source Restriction clause, *the actual production facility must be domestically situated,* that is, located in the United

States or Canada." Admin. R. Tab 1(C) at 10 (emphasis added). Since SpaceChem is an American company that proposes to manufacture hydrazine in a facility in the United States, DESC concluded it met the domestic source requirement. *See* Admin. R. Tab 25, at 6–8 (Source Selection Decision Memorandum awarding contract to SpaceChem).

Arch contends that an interpretation that allows SpaceChem to compete is irrational and not in accordance with law. Arch bases its argument on two theories: 1) that the Defense Production Act of 1950 ("DPA"), 50 U.S.C. app. §§ 2061–2171, contains a definition of "domestic source," 50 U.S.C.A. app. § 2152(8), which supplies the meaning for the term domestic source as it is used in the Solicitation; [20] and 2) that because hydrazine is to be procured under the Solicitation using a rated order, only a domestic prime contractor using domestic subcontractors may compete for the contract awarded under the Solicitation.

### 1. The Solicitation's Domestic Source Clause

The Solicitation restricts the range of potential contractors. *See* Admin. R. Tab 1, at 2; *see also* Admin R. Tab 13. The second page of the Solicitation contains this specific notice to potential offerors:

> This solicitation is restricted to domestic production sources only, that is, ONLY firms which currently produce, or intend to produce hydrazine (all grades) in the continental United States will be considered in the evaluation process, and subsequent award of a contract for this requirement, see DFARS clause 252.206–7000 DOMES-

TIC SOURCE RESTRICTION as incorporated into clause I105.

Admin. R. Tab 1, at 2.

The referenced DFARS clause is incorporated into the Solicitation as part of clause I1.05, Admin. R. Tab 1, at 25, which identifies it as: "Domestic Source Restriction (DEC 1991) (10 U.S.C. 2304)." *Id.* The provision of Title 10 that is parenthetically noted is part of CICA, the ultimate authority for the DFARS clause. The DFARS clause reads:

> As prescribed at 206.302–3–70, use the following provision:
>
> > Domestic Source Restriction (Dec. 1991)
> >
> > This solicitation is restricted to domestic sources under the authority of 10 U.S.C. 2304(c)(3). Foreign sources, except Canadian sources, are not eligible for award.

48 C.F.R. § 252.206–7000 (2004).

DESC identified a CICA provision, 10 U.S.C. § 2304(c)(3), as implemented by 48 C.F.R. § 6.302–3(b)(1)(v), as the statutory authority for restricting competition. Admin R. Tab 13, at 1.[21] The following justification for exercising the statutory authority under 10 U.S.C. § 2304(c)(3) was given:

> Hydrazine is considered strategic to the national defense of the United States. Contracts and delivery orders for missile fuels have been determined to be necessary and appropriate for priorities and allocations support to promote the national defense under the Defense Priorities and Allocations System (DPAS) ... [T]he Department of Commerce (DoC) has the statutory authority pursuant to the Defense Production Act (DPA) to direct contractors who possess DPAS rated contracts to prioritize delivery over all their other commer-

---

**20.** Paragraphs (3) through (17) of section 2152 were re-designated as paragraphs (4) through (18), respectively, by the Defense Production Act Reauthorization of 2003, Pub.L. No. 108–195, 117 Stat. 2893. The official *United States Code,* last published in 2000, has not been updated to reflect the re-designation; however, as the parties referred to the paragraphs by their re-designated numbers in their briefs and at oral argument, the Court will refer to the paragraphs by their re-designated numbers, as they appear in the *United States Code Annotated.*

**21.** Tab 13 of the Administrative Record is titled "Justification for Other than Full and Open Competition for Production, Storage, and Support Services of all grades of Hydrazine under authority of 10 U.S.C. § 2304(c)(3) Industrial Mobilization." It was signed by various DESC officials and it was approved by the Defense Logistics Agency senior procurement executive on April 22, 2003. Admin R. Tab 13, at 3.

cial contracts/orders. However, the DoC authority of the DPA does not extend beyond the boundaries of the United States ... As such, DoC has no authority to mandate and obtain compliance with DPAS ratings on contracts awarded to non-domestic sources. Therefore, *competition must be restricted to offers only from domestic sources* in order for delivery orders placed under the resultant contract to be DPAS rated. Hydrazine is critical to the DoD and NASA, as well as the commercial space industry, which also supports national defense programs. A domestic industrial base must be maintained in order for DPAS Defense Program A2, Missiles, to be supported ... If a non-domestic source is allowed to offer and is awarded the contract, no domestic source will exist over which DoC will have the legal authority to mandate that the U.S. Government's orders have priority, if necessary. It is essential that the programs discussed above have a reliable, domestic industrial base upon which to depend.

Admin. R. Tab 13, at 1 (emphasis added). As is indicated in the above justification, the Solicitation was given a "DO–A2" [22] rating under the Defense Priorities and Allocation System ("DPAS"), 15 C.F.R. §§ 700.1–700.93. Admin. R. Tab 1, at 1.

The DESC justification included additional reasons for restricting competition to firms which will physically locate their production facility in the United States: "[t]he logistics of a non-domestic source heightens the risk of product going 'off-spec' during shipment"; when mixed with certain other substances, "hydrazine becomes extremely volatile and explosive," and thus if the "only source for hydrazine is located in a foreign country, the Government would have little control over such events as the risk of potential terrorist or hostile action"; and "risks associated with the transportation of hydrazine from a non-

domestic producer have dramatically increased." Admin. R. Tab 13, at 2–3.

### 2. Does the DPA's Definition of Domestic Source Apply?

■ DESC clearly intended the domestic source restriction clause to require only that the production facilities of potential contractors be located in the United States. But according to Arch, the term "domestic source" requires a more severe restriction. It argues that the Defense Production Act definition of "domestic source" applies to the Solicitation, and that this definition would exclude SpaceChem from competition. Arch would interpret "domestic source" by reference to the DPA, which defines "domestic source" as a business concern:

> (A) that performs in the United States or Canada substantially all of the research and development, engineering, manufacturing, and production activities required of such business concern under a contract with the United States relating to a critical component or a critical technology item; and

> (B) that procures from business concerns described in subparagraph (A) substantially all of any components and assemblies required under a contract with the United States relating to a critical component or critical technology item.

50 U.S.C.A. app. § 2152(8) (West Supp. 2004).[23]

The first difficulty with Arch's position is that the actual terms of the restriction do not reference the DPA definition of domestic source. As is noted above, the DFARS clause, 48 C.F.R. § 252.206–7000, is incorporated by reference at clause I1.05 of the Solicitation, which cites the CICA provision, 10 U.S.C. § 2304, as its authority. Admin. R. Tab 1, at 25. The DFARS clause itself provides that the Solicitation "is restricted to domestic sources under the authority of 10 U.S.C. 2304(c)(3)," and states that it is to be

---

**22.** The Solicitation states that it is rated "DO–A20"; however, this appears to be a typographical error. "DO–A2" is the proper classification for missiles, and is the rating used elsewhere in the record, *see, e.g.,* Admin. R. Tab 13, at 1; category "DO–A20" is not listed in the DPAS. *See* 15 C.F.R. Part 700 Schedule 1.

**23.** A "foreign source" is defined as "a business entity other than a 'domestic source.'" 50 U.S.C.A. app. § 2152(11).

used "[a]s prescribed at [48 C.F.R. § ] 206.302–3–70." 48 C.F.R. § 252.206–7000. The referenced provision of the DFARS requires that 48 C.F.R. § 252.206–7000 be used "in all solicitations that are restricted to domestic sources under authority of FAR 6.302–3." 48 C.F.R. § 206.302–3–70 (2004). In turn, 48 C.F.R. § 6.302–3 describes when full and open competition need not be used for certain contracts and cites as its authority the CICA provisions 10 U.S.C. § 2304(c)(3) and 41 U.S.C. § 253(c)(3); it does not cite the DPA as its authority.

Thus, neither the DFARS domestic source restriction clause, nor the regulation it cites, nor the regulation cited in turn by the latter, rely on the DPA as its source or even mention the DPA. Despite this textual difficulty, Arch maintains that DESC—although concerned about only the physical location of a contractor's hydrazine plant—unwittingly invoked the DPA definition of "domestic source" by employing the unrelated DFARS clause. Arch proffers two arguments in support of this claim, one a matter of interpretation and the other a matter of authority.

Taking the interpretation argument first, Arch contends that the definition of "domestic source" from the DPA must be borrowed for the DFARS clause, for "[i]t is an elementary principle of statutory construction that the same term used in the same or related statutes is intended to have the same meaning." Pl.'s Mot. J. Admin. R. at 8–9. There are a number of problems with this argument. First, the authorities cited by Arch (and, indeed, all of the cases in turn cited by these) stand for the proposition that there is a presumption that *identical words* used in different parts of *the same act* are intended to have the same meaning." *Dept. of Revenue of Oregon v. ACF Industries, Inc.,* 510 U.S. 332, 342, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994) (citations and internal quotation marks omitted) (emphasis added); *see also, e.g., Gustafson v. Alloyd Co.,* 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995); *Sorenson v. Secretary of Treasury,* 475 U.S. 851,

860, 106 S.Ct. 1600, 89 L.Ed.2d 855 (1986); *Helvering v. Stockholms Enskilda Bank,* 293 U.S. 84, 87, 55 S.Ct. 50, 79 L.Ed. 211 (1934); *Atlantic Cleaners & Dyers, Inc. v. United States,* 286 U.S. 427, 433, 52 S.Ct. 607, 76 L.Ed. 1204 (1932); *SKF USA Inc. v. United States,* 263 F.3d 1369, 1381 (Fed.Cir.2001). Each one of these cases concerns *identical language* appearing in the *same act of Congress*—the "elementary principle" advanced by Arch does not, in the case law, extend to "related statutes." Nor should it. This presumption—which is far from ironclad, *see Atlantic Cleaners,* 286 U.S. at 433, 52 S.Ct. 607 ("presumption is not rigid"); *United States v. Cleveland Indians Baseball Co.,* 532 U.S. 200, 213, 121 S.Ct. 1433, 149 L.Ed.2d 401 (2001) (same)—is not based on the legal fiction of legislative omniscience, but rather on the "natural" belief that the same words used in the same context (temporally and textually) by the same institution mean the same thing.

Here, we are dealing with two distinct acts of Congress—CICA and the DPA—that are not even found in the same title of the U.S.Code.[24] Further, the acts do not even use the same term. The CICA provision does not use the term "domestic source," but instead refers to "a particular source or sources ... available for furnishing property or services in case of a national emergency or to achieve industrial mobilization." 10 U.S.C. § 2304(c)(3) (2000).[25] The term "domestic source" used in the Solicitation has an entirely different institutional author, as it comes not from Congress but from the Department of Defense. *See* 48 C.F.R. § 252.206–7000; Admin. R. Tab 1, at 25. Under CICA, the use of "procedures other than competitive procedures" is authorized when necessary "to maintain a facility, producer, manufacturer, or other supplier available" in a national emergency or for industrial mobilization. 10 U.S.C. § 2304(c),(c)(3)(A). This power is implemented in 48 C.F.R. § 6.302–3, which allows DESC to "[c]reate or

24. Indeed, the relevant DPA provision is not even codified, but is placed in an Appendix to Title 50.

25. Thus, Arch's reliance on *Butterbaugh v. Dept. of Justice,* 336 F.3d 1332, 1338–39 (Fed.Cir. 2003), *see* Pl.'s Mot. J. Admin. R. at 11, is misplaced, as this case does not present an agency interpretation of the same term found in closely-related statutes.

maintain the required domestic capability for production of critical supplies by limiting competition to items manufactured in ... [t]he United States or its outlying areas." 48 C.F.R. § 6.302–3(b)(1)(v) (2004). The DFARS domestic source clause is based on this regulation, and ultimately rests on the CICA authority to restrict competition to "maintain a facility, producer, manufacturer, or other supplier available."

Further, it is not appropriate to interpret the DFARS term "domestic sources" in light of the DPA definition, for another reason apart from the fact that the DFARS clause is issued under the authority of an entirely different statute. The DPA's definition of domestic source is of relatively recent genesis. Although the DPA was originally authorized in 1950, and has been re-authorized several times since, the definition of domestic source was not added to the DPA until October 28, 1992. Defense Production Act Amendments of 1992, Pub.L. No. 102–558, § 132, 106 Stat. 4210 (1992). Thus, the definition was added some ten months *after* December, 1991; that is, ten months after the DFARS clause, 48 C.F.R. § 252.206–7000— which Arch argues incorporates the DPA definition—became effective.[26] Of course, the CICA authority upon which 48 C.F.R. § 252.206–7000 is based necessarily pre-existed the DPA definition of domestic source. Since the DFARS domestic source clause, and the authority for its promulgation, 10 U.S.C. § 2304(c)(3), were in existence prior to domestic source being defined in the DPA, it is simply not reasonable to argue that these older provisions are tied to the meaning of the later-enacted one. There is no canon of construction that assumes the powers of premonition.

Not only do the CICA provision and the DFARS clause pre-date the DPA domestic source definition, but they have not subsequently been amended to reference or incorporate the DPA definition. The DPA definition of "domestic source" expressly extends only to the DPA itself. 50 U.S.C.A. app.

§ 2152 (definitions apply "[f]or purposes of this Act"). A provision of the DPA does cite the relevant CICA provision—under certain circumstances, which are discussed further below, the President is required to take action which may include "restricting contract solicitations to domestic sources pursuant to" 10 U.S.C. § 2304(c)(3). 50 U.S.C. app. § 2077(b)(3)(B) (2004). But this language does not purport to modify CICA so that the only exception to full and open competition permissible is to limit competition to domestic sources as defined in the DPA. Rather, this provision recognizes that the broad power to restrict competition under CICA may be used to restrict competition to domestic sources, as defined in the DPA, to accomplish the ends of the DPA. Merely because CICA can be used to restrict competition when the DPA applies does not mean that it can only be used when the DPA applies.

■ This brings us to the alternative argument of Arch, which raises a question of authority. Specifically, Arch argues that the DPA *must* apply and actually *requires* DESC to restrict competitors to domestic sources per the DPA definition, 50 U.S.C.A. app. § 2152(8). *See, e.g.,* Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. J. Admin. R. ("Pl.'s Reply") at 5–7; Tr. (Jan. 19, 2005) at 8–15. Arch contends that hydrazine is a "critical component" or a "critical technology item," under the DPA, 50 U.S.C.A. app. §§ 2077, 2152(1),(4),(5),(8); therefore, when the competition was restricted to domestic sources, the DPA's definition of domestic source had to apply. This argument does not turn on the interpretation of the DFARS domestic source clause included in the Solicitation, but rather on the interpretation of the DPA. Even if DESC assumed it was restricting competition under CICA, according to Arch, the critical nature of hydrazine would trigger the DPA and, hence, DESC unlawfully failed to restrict competition enough.

Under this argument, the DPA's definition of domestic source would apply, because hy-

---

**26.** At oral argument, Arch's counsel argued that the concept of a "domestic source" exception dates back to the Armed Services Procurement Act. Tr. (Jan. 19, 2005) at 134. But that act does not appear to have contained that term, let alone

a definition of it. Armed Services Procurement Act of 1947, Pub.L. No. 80–413, 62 Stat. 21, *amended by* Pub.L. No. 82–245, 65 Stat. 700; Pub.L. No. 84–268, 69 Stat. 551.

drazine is either a critical component or a critical technology item as these are defined by the DPA. Under the DPA, the President is required to "take appropriate actions to assure that critical components or critical technology items are available from reliable sources ...." 50 U.S.C. app. § 2077(b)(2). Appropriate actions the President may take include: restricting competition to reliable sources; restricting competition to "domestic sources" under CICA or "other statutory authority;" stockpiling critical components; and developing substitutes. *Id.* at § 2077(b)(3). This provision states that "appropriate action *may* include" the identified actions, 50 U.S. app. § 2077(b)(3) (emphasis added), and thus one could argue that this is not an exhaustive list, allowing the use of CICA to restrict competition less severely than to "domestic sources" as defined in the DPA.[27] The more natural reading, however, is that if CICA is employed under this provision, it must be to restrict bidders to "domestic sources" as defined in the DPA. The President has instructed each agency head to take appropriate action to comply with this DPA provision. Exec. Order No. 12,919, 59 Fed.Reg. 29,525 (June 3, 1994).

But this DPA provision only applies to "critical components" and "critical technology items." The DPA defines "critical component" as follows:

The term "critical component" includes such components, subsystems, systems, and related special tooling and test equipment essential to the production, repair, maintenance, or operation of weapon systems or other items of military equipment *identified by the Secretary of Defense as being essential to the execution of the national security strategy* of the United States. Components identified as critical

by a National Security Assessment conducted pursuant to section 113(i) of title 10, United States Code [10 U.S.C.A. § 113(i)], or by a Presidential determination as a result of a petition filed under section 232 of the Trade Expansion Act of 1962 [19 U.S.C.A. § 1862] shall be designated as critical components for purposes of this Act [sections 2061 to 2171 of this Appendix], unless the President determines that the designation is unwarranted.

50 U.S.C.A. app. § 2152(1) (emphasis added); *see also* 50 U.S.C. app. § 2077(b)(1)(B).[28]

A critical technology item is a material "directly employing, derived from, or utilizing a critical technology," *Id.* § 2152(5), and critical technology "includes any technology that is included in 1 or more of the plans submitted pursuant to section 6681 of title 42, United States Code, or section 2508 of title 10, United States Code (unless subsequently deleted), or such other emerging or dual use technology as may be designated by the President." 50 U.S.C.A. app. § 2152(4). Concerning the term "critical technology item," Arch has not alleged that any "plans" have been submitted pursuant to the statutory authority cited, or that hydrazine relates to any "other emerging or dual use technology," and thus the Court concludes that this term is not relevant to the Solicitation at issue.

Focusing, then, on the term "critical component," the DPA instructs the President, acting through the Secretary of Defense, to "identify critical components ... for each item on the Critical Items List ... and other items within the inventory of weapon systems and defense equipment." 50 U.S.C. app. § 2077(b)(1)(A). Similarly, the definition of "critical component" specifies that these are to be "identified by the Secretary

---

27. Along these lines, one could also posit that, even were hydrazine a "critical component," this section was satisfied by the "stockpiling" of inventories to last until January, 2009. *See* Admin. R. Tab 34, at 1. Thus, a CICA exception may have been used for other reasons, not triggering the "domestic source" definition.

28. Section 2077 of the Appendix to Title 50 reiterates this, under the sub-heading "Definition," but omits the first sentence. It reads:

Any component identified as critical by a National Security Assessment conducted pursuant to section 113(i) of title 10, United States Code, or by a Presidential determination as a result of a petition filed under section 232 of the Trade Expansion Act of 1962 [19 U.S.C. 1862] shall be designated as a critical component for purposes of this Act [sections 2061 to 2171 of this Appendix], unless the President determines that the designation is unwarranted.

50 U.S.C. app. § 2077(b)(1)(B). It does not contain a definition for "critical technology items."

of Defense as being essential to the execution of the national security strategy of the United States," or identified as critical by certain other statutory means.[29] 50 U.S.C.A. app. § 2152(1). Arch argues that this identification was accomplished merely by DESC giving the Solicitation a "DO–A2" priority rating, as "by definition DO means critical to national defense." Tr. (Jan. 19, 2005) at 14:1–5. But the priority ratings under the DPAS do not require a finding that the contract is "essential to the execution of the national security strategy," but rather that it is "necessary or appropriate to promote the national defense." *Compare* 50 U.S.C.A. app. § 2152(1) *with id.* § 2071(a). This is a lower standard. *See also* 15 C.F.R. §§ 700.1(a), 700.8 (2004).[30]

Arch also contends that what is required for "identification is not the components so much as it is the weapons system" for which they are essential. Tr. (Jan. 19, 2005) at 15. But under the most natural reading of the DPA "critical component" definition, what the Secretary must have identified are the "components, subsystems, systems, and related special tooling and test equipment" that are essential, not the weapons systems or military equipment. *See* 50 U.S.C.A. app. § 2152(1). This interpretation is confirmed by the second sentence of this definition, which concerns "[c]omponents identified as critical," *id.*, as well as by section 2077's requirement that the Secretary of Defense "shall identify critical components." 50 U.S.C. app. § 2077(b)(1)(A). Thus, it would not be enough that hydrazine is used in weapons systems that are "essential to the execution of the national security strategy of the United States" or are on the Critical Items List. *Id.* §§ 2152(1), 2077(b)(1)(A).

Moreover, one questions whether this Court, let alone any court, could appropriately determine whether something that had not been identified as a "critical component" by the Secretary of Defense should have been so identified.[31] These types of decisions have been committed to the political branches of our government. *See* U.S. Const. art. I, § 8, cl. 14; art. II, § 2, cl. 1. As with other matters involving military and national security decisions, "unless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military and national security affairs." *Dep't of the Navy v. Egan,* 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988); *see also Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973) (holding that the "ultimate responsibility" for decisions which are "essentially professional military judgments … is appropriately vested in branches of the government which are periodically subject to electoral accountability"); *Voge v. United States,* 844 F.2d 776, 779 (Fed.Cir.1988) ("Judicial deference must be 'at its apogee' in matters pertaining to the military and national defense").

Thus, the question that must be answered, for section 2077 to apply, is whether the Secretary of Defense has identified hydrazine as a "critical component" under the DPA. Nothing in the record indicates that he has. To the contrary, there is a (somewhat ambiguous) memorandum in the record that states "hydrazine is not on the critical items list for DoD," and that had Arch "raised an issue about hydrazine being a critical item, DESC would have documented the file to note that hydrazine is not a critical item." Admin. R. Tab 41, at 1–2. Although this document uses the terms "critical item,"

29. These other statutory means involve formal processes under 10 U.S.C. § 113(i) and 19 U.S.C. § 1862. 50 U.S.C.A. app. § 2152(1). Arch has not contended that either of these processes have been used to identify hydrazine as a critical component, and the record contains no evidence that these processes were so used.

30. The fact that DO orders are given lower priority than DX orders, *see* 15 C.F.R. § 700.11(a)(2), also undermines Arch's argument, as one would think that the highest priority would be given to a contract that is "essential to the execution of

the national security strategy of the United States." 50 U.S.C.A. app. § 2152(1).

31. Such a matter would perhaps more appropriately be raised in an APA review of a petition denial under 19 U.S.C. § 1862, although it is questionable that a presidential decision that a critical component "designation is unwarranted" under the authority of 50 U.S.C.A. app. §§ 2077(b)(1)(B) and 2152(1) could be the subject of court review.

"critical component," and "critical technology item" in one sentence, what is specifically denied is only hydrazine's status as a "critical item." *Id.* But what matters is not whether hydrazine made its way onto the "Critical Items List," which appears to be composed of weapons and equipment, but whether it was identified as a critical component for a critical item or for "other items within the inventory of weapons systems and defense equipment." 50 U.S.C. app. § 2077(b)(1)(A).

This is not a subtle distinction, although it is possible that when the SSA wrote "hydrazine is not a critical item" she used "critical item" in a generic sense to encompass "critical components" and "critical technology items." The Government concludes so, citing this document as evidence that hydrazine "has not been identified as a 'critical component' or 'critical technology item.'" Def.'s Opp'n to Pl.'s Motion & Cross–Motion ("Cross–Motion") at 14; *see also* Def.'s Reply at 6 (stating hydrazine "has not been so identified by the President" as a critical component or critical technology item).

On the other hand, Arch bases its case for "critical component" status not on any specific identification by the Secretary of Defense, but rather on statements in the record concerning the importance of hydrazine. Of these, there are many. The justification issued by DESC in support of the decision to restrict competition invokes the authority under 48 C.F.R. § 6.302–3(b)(1)(v) to dispense with full and open competition when "necessary to . . . create or maintain the required domestic capability for production of *critical supplies.*" Admin. R. Tab 13 at 1 (emphasis added). Hydrazine is described as being of "*vital use* in the launch and aerospace industry," and "a guaranteed supply of hydrazine is *vital to the National Defense.*" *Id.* (emphases added). The justification further states, "[h]ydrazine is considered *strategic to the national defense* of the United States," and "[i]t is *essential* that the [defense] programs discussed above have a reliable, domestic industrial base upon which to depend." *Id.* (emphases added).

But all the statements in the record calling hydrazine "vital," or "essential" or "strategic," or even "critical" to the national defense, do not add up to a determination by the Secretary of Defense that it is a "critical component" under the DPA. One may argue that they suggest that such an identification should have been made, but, for the reasons explained above, it is the *identification* itself that matters. This Court has neither the power, the responsibility, nor the expertise to second-guess military judgments made by the President or the Secretary of Defense.

Of course, if the decision to identify hydrazine as a critical component *had been made* in the affirmative, but had been kept from the Administrative Record, this would be alarming. It does give the Court pause when defendant relies on the *absence* of evidence in the record showing that the Secretary had identified hydrazine as a critical component, *see, e.g.,* Cross–Motion at 14; Def.'s Reply at 5–6, rather than the certain fact that he had not—as defendant is the only party in a position to know for sure, given the classified nature of this information. *See* Tr. (Jan. 19, 2005) at 86, 91. One assumes that such "no evidence in the record" formulations are mere rote, and that, regardless of whether the fact appeared in the record, if defendant knew that hydrazine had been identified as a "critical component" the point would have been conceded.[32]

In any event, if hydrazine had never been identified as a "critical component," this is the sort of fact that is unlikely to appear naturally in an Administrative Record—as why would one document the fact that something had not happened? This is the reason the Court allowed the document at Tab 41 in the record, as discussed above, and it is why narrow, focused discovery on this very point might have been allowed, if sought. The Court finds it is reasonable to infer from the memorandum at Tab 41 that DESC knew that hydrazine had not been identified as a "critical component," and thus concludes that the DPA "domestic source" definition cannot

---

**32.** If it later turned out that such an identification had been made, of course, this would impli-

cate RCFC 11 and 60.

be grafted onto the Solicitation through this means.[33]

■ Thus, far from being a "clear and prejudicial violation of applicable statutes or regulations," *Banknote*, 365 F.3d at 1351, DESC acted properly in using the DFARS domestic source clause to restrict competition to firms intending to locate production facilities in the United States. This manner of restriction is authorized under CICA, 10 U.S.C. § 2304(c)(3), and the FAR, 48 C.F.R. § 6.302–3(b)(1)(v), which is the authority underlying the DFARS clause. *See* 48 C.F.R. §§ 252.206–7000, 206.302–3–70. The DPA did not modify this general authority, and the Solicitation does not concern a "critical component" under the DPA.[34] DESC did not unlawfully misinterpret the domestic source restriction clause from the DFARS in accepting an offer from an American company that proposes to manufacture hydrazine in the United States.

*3. Rated Orders*

■ Arch also comes at the domestic source restriction from another angle, arguing that because a contract awarded under the Solicitation will lead to the placement of rated orders for hydrazine, only domestic prime contractors using domestic subcontractors may compete. The DPA authorizes the President "to require preferential acceptance

and performance of contracts and orders supporting certain approved national defense and energy programs, and to allocate materials, services, and facilities in such a manner as to promote these approved programs." Richard V. Meyers, *Preface* to Defense Priorities and Allocations System Booklet, at i (1998); *see* 50 U.S.C. app. § 2071. This DPA authority has been delegated to the Department of Commerce ("Commerce"). Exec. Order No. 12,919, 59 Fed.Reg. 29,525 (June 3, 1994). The DPAS was established for the purpose of administering a system of priorities and allocations of resources covered by the authority delegated to Commerce. Accordingly, the DPAS "ensures the timely availability of industrial resources for approved programs and provides an operating system to support rapid industrial response to a national emergency." 15 C.F.R. § 700.1(d).

Approved programs receive a rating; Commerce has delegated authority to place ratings on government contracts and orders to the appropriate government agencies that issue such contracts or orders. Thus, if DESC issues a contract or order for an appropriate item, it also places a rating on that contract or order. In this case DESC gave hydrazine a rating of DO and a program identification symbol of A2.[35] The significance of a rated order is that a person [36]

---

**33.** Defendant's argument that a fluid such as hydrazine could not be considered a "component" in any event, *see* Tr. (Jan. 19, 2005) at 89, is also persuasive. A fuel would not seem to fit with the enumerated list of "components, subsystems, systems, and related special tooling and test equipment." 50 U.S.C.A. app. § 2152(1).

**34.** The Court notes that SpaceChem would appear to qualify as a domestic source even under the DPA definition. The technical assistance (including intellectual property licenses) SpaceChem has proposed to receive from SNPE would not necessarily make SpaceChem a foreign source. Under the DPA's definition, SpaceChem would have to "perform[ ] in the United States or Canada *substantially all* of the research and development, engineering, manufacturing, and production activities required" under the contract and "procure[ ] from [domestic] business concerns ... *substantially all* of any components and assemblies required under [the] contract ...." 50 U.S.C.A. app. § 2152(8) *(emphasis added)*. As a factual matter "substantially all" the hydrazine produced under a contract awarded to SpaceChem would be produced in the United

States, in a proposed Mississippi facility. Admin. R. Tab 18 at 4. The contract under the Solicitation will be for hydrazine, and hydrazine distribution and transportation services, not for research and development or engineering. Admin. R. Tab 1, at 2.

**35.** A priority rating consists of a rating, either DX or DO, and a program identification symbol. 15 C.F.R. § 700.3(a). Program identification symbols identify which approved program is involved; the symbols are listed in Schedule 1 of the DPAS. *See* Schedule 1 to 15 C.F.R. Part 700. DX rated orders take priority over DO rated orders and DO rated orders take priority over unrated orders. 15 C.F.R. § 700.11(a)(2).

**36.** A "person" is defined as "any individual, corporation, partnership, association, other organized group of persons, or legal successor or representative thereof; or any authorized State or local government or agency thereof ...." 15 C.F.R. § 700.8.

who accepts a rated order must give that order production preference over unrated orders; thus, for example, "[i]f a person receives a DO rated order with a delivery date of June 3 and if meeting that date would mean delaying production or delivery of an item for an unrated order, the unrated order must be delayed." 15 C.F.R. § 700.14. Persons who receive rated orders must in turn place rated orders with their suppliers for the items [37] they need to fill the orders. 15 C.F.R. § 700.3(d); *see also* 15 C.F.R. § 700.17. Failure to deliver rated orders on time can result in criminal penalties and fines. 15 C.F.R. § 700.74. However, the Government's enforcement powers have no legal authority outside the United States.[38]

Arch protests that SpaceChem cannot place rated orders with SNPE or any other foreign entity it is relying on in the initial stages of developing a hydrazine production facility and process; therefore, according to Arch, DESC's interpretation that SpaceChem is eligible to compete for the contract to be awarded under the Solicitation is not in accordance with law. The DPAS does provide that "[a] person must use rated orders to obtain … [s]ervices, other than contracts of employment, needed to fill rated orders." 15 C.F.R. § 700.17. The period Arch focuses on in making this argument is the period between the contract's issuance and September 1, 2007, when production is to begin—the period in which SpaceChem will be building its plant and developing its process.

The DPAS does not treat an order placed under a requirements contract or other "similar procurement document" as a rated order "as of the date of the original procurement document"; instead, the DPAS considers an order placed under a requirements contract rated "as of the date of receipt [of a purchase order] by the supplier." 15 C.F.R. § 700.12(b). The contract that is awarded as a result of the Solicitation will be a requirements contract. The Solicitation states "[t]his is an indefinite quantity contract" and that:

> any contract awarded as a result of this solicitation will be a REQUIREMENTS–TYPE contract. The Government agrees to order from the Contractor and the Contractor shall deliver, if orders are placed by the DESC Contracting Officer during the contract period, all products and/or services awarded under this contract, as allowed by the REQUIREMENTS clause.

Admin. R. Tab 1, at 7. Thus, an order for hydrazine does not become "rated" until the actual order for hydrazine is made. In other words, if DESC awards the contract under the Solicitation to SpaceChem, no rated orders would be placed until DESC issues a purchase order for a quantity of hydrazine from SpaceChem.

Therefore, services received from foreign companies, such as SNPE, can be used until a rated order is placed with SpaceChem. According to the Administrative Record, the Government has sufficient supply of high purity hydrazine at least until January 2009, and has sufficient supply of all other grades of hydrazine beyond January 2009. Admin. R. Tab 34, at 1. Under the terms of the Solicitation, production of hydrazine does need to begin until September 1, 2007. Admin. R. Tab 1(P), at 3.

By that time, the SpaceChem production facility would necessarily be up and running, and the technical assistance from SNPE in constructing it would have already been received. It is mere speculation that any rated orders issued from that point on would require an order in turn from a foreign supplier of materials or services, and there is no more reason to believe that SpaceChem would violate these contractual obligations than would Arch. Presumably, SpaceChem is aware of the fact that it would be required to place rated orders with subcontractors once it receives rated orders. Nothing in the Administrative Record demonstrates that SpaceChem will necessarily violate the rated

---

37. Item is defined as "any raw, in process, or manufactured material, article, commodity, supply, equipment, component, accessory, part, assembly, or product of any kind, technical information, process, or service." 15 C.F.R. § 700.8.

38. It is possible to place rated orders with Canadian companies; however, special steps must be taken and requests to place rated orders with Canadian companies can be denied. *See* 15 C.F.R. § 700.55.

order requirements.[39] The Court thus concludes that DESC did not act contrary to law in determining that SpaceChem was eligible to be awarded a contract under the Solicitation.

## D. Price Evaluation Methodology

Arch's second ground for protest is that the Solicitation's price evaluation methodology lacks a rational basis. Compl. ¶¶ 30–33, 37–39; Pl.'s Mot. J. Admin. R. at 14–20; Pl.'s Reply at 16–22. The Solicitation, as amended, states that the Government will award a contract "to the responsible offeror whose offer ... will be the most advantageous to the Government, price and other factors considered." Admin. R. Tab 1(P), at 18. In evaluating the award of the contract, the non-cost factors when combined are to be approximately equal to price. *Id.* The price to be considered in the evaluation is "the sum of the offeror's total price including options, the transportation costs, and the imputed costs of financing payments, if any ... No other costs will be included in the price evaluation." *Id.* at 19. Arch contends that it is irrational for this price evaluation methodology to exclude, as other price-related factors, certain costs that DESC will save if the contract is awarded to Arch, and costs DESC will necessarily incur if the contract is awarded to an offeror other than Arch. Two excluded costs remain in dispute in this action: Arch's plant shutdown costs and the cost of requalifying a new manufacturing process design.[40]

### 1. Plant Shutdown–Related Costs

■ Under the terms of Arch's hydrazine production contract, Contract No. F09603–

01–D–0135, the Government is required to pay Arch a lump sum of $8,513,000 in "plant shutdown related costs" for the shutdown and dismantling of Arch's Lake Charles Facility. Admin. R. Tab 6, at 2–3; *id.* Tab 7, at 2; *see also* Tr. (Jan. 19, 2005) at 46. This amount must be paid in full within 60 days after Arch "obtains all applicable permits and licenses necessary and commences work to shut down the facility." Admin. R. Tab 6, at 3. Since these plant shutdown-related costs will be triggered if the contract under this Solicitation is awarded to any other offeror, Arch argues these costs should have been included in the price evaluation methodology as a price-related factor.

The Government argues that the exclusion of these costs "would enhance competition," which is rational since "the *sine qua non* of DESC's hydrazine procurement strategy is to foster competition in order that the Government obtain the 'most advantageous' price for hydrazine." Cross–Motion at 23. Because the incumbent "has an inherent competitive advantage in that Arch already possesses the requisite facilities and technology," the Government further contends, "DESC, by excluding price related factors from its evaluation process, reasonably anticipated that competition would thereby be encouraged." *Id.* at 24. Additionally, the Government argues that the plant shutdown costs are too speculative to be included in the evaluation process and that the FAR prohibits the inclusion of a price reduction from another contract as an evaluation factor. The Government's arguments are without merit.

39. The Court also finds that the continuing responsibilities of subcontractor SNPE, once the production facility has been constructed, are not of the type that would require any sort of order from SpaceChem. *See* Admin. R. Tab 18, at 1, 2, 4, 6; *id.* Tab 21 (Subcontract Teaming Agreement).

40. Arch originally contended that the price evaluation needed to include the time value of money, transportation costs, and the increased cost of high purity hydrazine ("HPH") in the price evaluation methodology. The dispute over the time value of money was resolved in Amendment 0021 to the Solicitation, as were the transportation

costs. Admin. R. Tab 1(U), at 2–4; *see also* Tr. (Jan. 19, 2005) at 78–79. In its Reply brief and at oral argument Arch dropped its protest over the increased cost of HPH. *See* Tr. (Jan. 19, 2005) at 78:15–22. Under Arch's interim HPH contract, Contract No. SP0600–04–D–1520, the Government would receive HPH at lower prices if Arch were awarded the hydrazine contract under the Solicitation by May 31, 2004. Admin. R. Tab 8, at 2–3. Were Arch to offer to reinstate this price reduction, this would be constitute a "proposed price reduction," which cannot be an evaluation factor. *See* 48 C.F.R. § 15.402(b)(1) (2004).

As defendant recognizes in its stated hydrazine procurement strategy, noted above, competition, like democracy, is not an end but a means to the accomplishment of ends. In particular, competition is expected to lead logically to increases in the quality and decreases in the price of the product one seeks to obtain.[41] This is inherent in the very nature of competition, as firms *compete* with each other to attract and maintain customers for their products and services, and price and quality are the two basic variables of such products and services.[42] Thus, the competitive process provides firms with the incentive to innovate and improve their products and production methods, and to constrain their costs so that they may underprice their competitors.

Under this "best value" procurement process, the Government has decided, as is its right, to make the price and the quality (or "technical excellence") factors of roughly equal weight. *See* Admin. R. Tab 1(P), at 18–19. The evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations. *See E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir. 1996); *Gulf Group,* 61 Fed.Cl. at 351; *Overstreet Electric Co. v. United States,* 59 Fed. Cl. 99, 102, 108, 117 (2003).

This level of deference also extends to review of the "best value" trade-offs between price and technical performance. *E.W. Bliss Co.,* 77 F.3d at 449. Arch's protest, however, is pre-award, and it is the price factor, not the technical factors, that is at issue. Thus, only the ordinary deference that is incorporated in the APA standard of review is appropriate. *See* 5 U.S.C. § 706(2)(A); *Information Technology & Appl'ns Corp. v. United States,* 316 F.3d 1312, 1319 (Fed.Cir.

2003). The question, then, is simply whether there was a rational basis, given the evidence in the Administrative Record, for DESC to have excluded the $8,513,000 of plant shutdown costs from the price evaluation methodology.

The Government argues that it sought "the 'most advantageous' price for hydrazine." Cross–Motion at 23. The price to be paid by the taxpayers for hydrazine, however, if an offeror other than Arch is awarded the contract, will be the sum of the price under the new contract plus the plant shutdown costs that the Government is obligated to pay Arch. If the best price is what one is looking for, then it is irrational to close one's eyes to these shutdown costs. If the cost-savings under a competitor's offer are less than the plant shutdown costs, then awarding the contract to that competitor is not "most advantageous" for the taxpayers. Saving, say, $5 million on a contract that will necessarily trigger an extra expense of $8 million is no net benefit to taxpayers.

The Government argues that including costs like the plant shutdown costs would discourage competition, and that these costs were "expected to be more than offset by encouraging competition." *Id.* at 24. It cites as proof the $[XXXXXXXX] difference between Arch's initial offer and SpaceChem's ultimate price under the initial award. *See* Admin. R. Tab 35, at 2. The flaw in this reasoning, however, is that if the only goal is to obtain competition, than all manner of schemes to "encourage competition" could be justified. For instance, the price evaluation methodology could involve cutting in half the prices of all new offerors for purposes of comparison with the incumbent. This would likely increase the number of competitors, but it is not designed to result in the "most advantageous price." And, as we shall see,

---

**41.** The legislative history of the Competition in Contracting Act of 1984, Pub.L. No. 98–369, 98 Stat. 1175, recognizes this. *See* S.Rep. No. 98-50, at 3 (1983), *reprinted in* 1984 U.S.C.C.A.N. 2174 (recognizing that "competition saves money" and that "increased product quality and reliability are potential benefits of competition").

**42.** *See, e.g.,* LUDWIG VON MISES, HUMAN ACTION 274 (3d revised ed., Contemporary Books 1966)

(1949) ("competition manifests itself in the fact that the sellers must outdo one another by offering better or cheaper goods and services"); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 594, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("cutting prices in order to increase business often is the very essence of competition").

this approach dilutes the incentive of new entrants to reduce costs and to reduce the prices they charge.

The Government's underlying assumption is that competitors will drive prices down, rather than inflate their bids in the direction of the incumbent's. This is a reasonable assumption. And if potential offerors know that the $8,513,000 plant shutdown costs are to be added to their price for purposes of evaluation, then this may well discourage those firms which believe that this amount exceeds any competitive pricing advantage they otherwise would have.[43] But such firms would not in any event provide the "most advantageous price" for taxpayers. On the other hand, firms which believe that their pricing advantage is larger than this cost have an incentive to lower their proposed prices if these costs are included (under the Government's underlying assumption about the effects of competition). Thus, if the "most advantageous price" is what the Government is seeking, it would be irrational to exclude the plant shutdown costs.

The Government also argues that including these costs is *"unfair"* to competitors because Arch obtained the right to these costs "through its bargaining power as the sole supplier of hydrazine." Admin. R. Tab 37 at 1. But regardless of whether the Government, despite its near-monopsonist position in the domestic hydrazine market, was the victim of a hard bargain when it agreed to pay these costs, it is a fact that this obligation exists.[44] Defendant argues that the shutdown costs are speculative and contingent, as Arch may decide not to shut down this facility. Cross–Motion at 26–27. DESC's CO for the Solicitation, during the GAO proceeding, opined that the facility "still would be required in order for Arch to

produce the hydrate or feedstock needed to make HPH for its Government and commercial customers." Admin. R. Tab 37, at 2.

But DESC also became aware, during the GAO proceeding, that Arch had "[XXXXX XXXXXXXXXXX XXXXXXXXXXXXXXXXXXXXXXXX XXXXXXXXXXXXXXXXXX XXXXXXXX]," and planned to shut down the Lake Charles Facility if it were not awarded the contract under this Solicitation. Pl.'s App. to Opp'n to Def.'s Cross–Mot., Ex. 2 at 2 (Decl. of Louis S. Massimo). Both Arch, *see id.,* and the Government acknowledged that there is insufficient demand for hydrazine to support more than one hydrazine production plant in the United States, and that the offeror awarded the contract under the Solicitation will therefore be the only domestic producer of hydrazine. *See* Admin. R. Tab 1, at 65 ("Since there is not anticipated to be sufficient commercial demand for these products to support additional production capabilities, the production plant built by the successful offeror is anticipated to be the only such facility in the United States."); *id.* Tab 13, at 1 ("The quantity of future requirements will not support two production facilities. If a non-domestic source is allowed to offer and is awarded the contract, no domestic source will exist ...."). It is unreasonable to deny that these shutdown costs will be incurred, and by being liquidated by agreement, their amount cannot reasonably be called speculative.[45] It is not disputed that Arch is entitled to $8,513,000 if it shuts down the Lake Charles plant. It would be irrational to assume that Arch would keep its hydrazine production facility open when there is little or no demand for hydrazine, especially when Arch stands to be paid $8,513,000 if it closes the facility.[46]

---

**43.** This pricing advantage may be due to lower costs of production, or a willingness to earn a smaller margin of profits than other firms.

**44.** The record also contradicts the Government's purported concern about the bargaining power of sole suppliers of hydrazine, as after awarding a contract under the Solicitation "it is anticipated that any follow-on buy will be non-competitive." Admin. R. Tab 13, at 2.

**45.** DESC engaged in its own speculation to justify excluding these costs, rationalizing that "if

Arch did get the contract using the existing facility, Arch would require a similar provision in the follow on contract." Admin. R. Tab 37, at 2.

**46.** In fact, Government counsel conceded during oral argument that "if Arch's offer and the low offer are so close that the $8.5 million in fact makes a difference ... the CO then has the authority to sit down with the offerors and say, 'I'm inclined to add the $8.5 million because I want to get the best price for the Government.'" Oral Argument Tr. at 121.

Finally, the Government's argument that including the plant shutdown-related costs would violate the FAR misconstrues 48 C.F.R. § 15.402(b)(1). What is prohibited is the use of *"proposed* price reductions under other contracts as an evaluation factor." 48 C.F.R. § 15.402(b)(1) (emphasis added). The plant shutdown costs are not *"proposed* price reductions"; rather, they are settled terms of Arch's existing hydrazine supply contract. *See* Admin. R. Tab 6. Arch is not seeking to swap a concession under a different contract for a more favorable evaluation under the Solicitation, but merely asks that the price evaluation accurately reflect the costs to the taxpayers of a new hydrazine contract. These shutdown costs may lawfully be added to the total evaluated price for offerors other than Arch.

For the reasons stated above, Arch's motion for judgment on the administrative record concerning the exclusion of the plant shutdown-related costs is GRANTED, as there was no rational basis for their exclusion. The Court finds that Arch would be irreparably injured if its offer under the Solicitation is evaluated under a price evaluation methodology that ignores the shutdown-related costs for its Lake Charles Facility, and that any inconvenience to the Government due to delay in evaluation and award under the Solicitation is outweighed by the harm that would be suffered by Arch if the price evaluation methodology is not amended.[47] The public interest would be furthered by amending the price evaluation methodology to include the Lake Charles Facility shutdown-related costs, as this will ensure that the evaluated prices accurately reflect the true costs to the taxpayers of a new hydrazine production contract. Thus, Arch is entitled to a permanent injunction, *see PGBA,* 389 F.3d at 1228–29, and an injunction has been issued on February 25, 2005, preventing an award under the existing price evaluation methodology and requiring that the Solicitation be set aside until it is amended so that the $8,513,000 in plant shutdown-related costs for plaintiff's Lake Charles Facility are added to the price of all offerors other than the plaintiff.

## 2. Re-qualification Costs

 Arch also argues that it was irrational for DESC to have excluded the cost of any re-qualification testing that will be necessary to qualify a new source of high purity hydrazine if an offeror other than Arch is chosen. Apparently, re-qualification testing would be required of a contractor other than Arch to ensure that there are no deficiencies in that offeror's process for producing high purity hydrazine that could cause failure of the military systems that use it, such as the Space Shuttle and the F–16. Arch contends DESC has recognized that re-qualification testing will be necessary and that DESC has estimated that the cost will be somewhere "in the $5M range over several years." *See* Pl.'s Mot. J. Admin. R. at 15; Admin. R. Tab 16, at 1.

Based on the documents in the record, it appears that DESC may have originally chosen not to include re-qualification costs in the Solicitation because developing a precise estimate of the costs could take "several more months." Admin. R. Tab 16, at 2. Arch contends that DESC presumably had ample time to develop a more precise estimate between February, when the issue originally came up, and July 23, 2004, when the Solicitation was re-competed. The Government continues to assert that the re-qualification costs are too speculative to be included as a price-related factor. Cross–Motion at 29.

Review of the Administrative Record demonstrates that it was reasonable for DESC to conclude that re-qualification costs were too speculative to be included as a price related factor. The five million dollar number that Arch points to as an estimate of the costs of re-qualification was according to NASA only a wild guess. *See* Admin. R. Tab 16, at 1–2. Hydrazine is used by thirty-five different customers of DESC and in forty-one different military and civilian programs. Admin. R. Tab 14, at 1–7. Thus, developing a specific cost estimate of re-qualification costs was a difficult process that remained highly specu-

---

**47.** In this regard, the Court again notes that DESC's existing supply of hydrazine is sufficient

to last through January, 2009. *See* Admin. R. Tab 34, at 1; Def.'s Statement of Facts ¶ 27.

lative at the time the Solicitation was issued and reissued.

In addition, it appears that the Government paid the cost of the original qualification of hydrazine produced by Arch. *See* Tr. (Jan. 19, 2005) at 73–74. One could argue that these qualification costs should also be added to Arch's price, adjusted for decades of inflation. This amply demonstrates that it was far from irrational for the Government to have left them out of the evaluation process. Arch's protest on this ground is denied.

### III. CONCLUSION

For the foregoing reasons the plaintiff's motion for judgment on the administrative record is **DENIED–IN–PART**, and **GRANTED–IN–PART**, as plaintiff is entitled to a declaratory judgment regarding the legality of excluding, from the Solicitation's price evaluation methodology, the plant shutdown-related costs for its Lake Charles Facility; and defendant's cross-motion for judgment on the administrative record is **GRANTED–IN–PART**, and **DENIED–IN–PART**. As repeated below, a permanent injunction was issued on February 25, 2005, requiring that DESC include the plant shutdown-related costs, $8,513,000, to the prices of all offerors other than Arch, in evaluating bids made in response to the Solicitation. For the reasons above, the Court hereby **ORDERS** the following:

1. The Court hereby declares that the price evaluation methodology contained in clause M2.11.100(c)(2) of Solicitation No. SP0600–03–R–0308 is arbitrary and irrational and, hence, unlawful, in that it excludes the $8,513,000 in plant shutdown-related costs for plaintiff's Lake Charles Facility from the costs of offerors other than the plaintiff.

2. The United States, including the Defense Energy Support Center, its Contracting Officer, and its other officers, agents, servants, employees, and representatives, and all persons acting in concert and participating with them respecting the subject procurement, be and they are hereby **PERMANENTLY RESTRAINED AND ENJOINED** from awarding a contract under Solicitation No. SP0600–03–R–0308, using a

price evaluation method that fails to add, as one of the "other price related factors" of clause M2.11.100(c)(2), the $8,513,000 in plant shutdown-related costs for plaintiff's Lake Charles Facility, to the price of offerors other than the plaintiff.

3. The United States, including the Defense Energy Support Center, its Contracting Officer, and its other officers, agents, servants, employees, and representatives, and all persons acting in concert and participating with them respecting the subject procurement, shall set aside Solicitation No. SP0600–03–R–0308, unless and until the Solicitation's price evaluation methodology, clause M2.11.100(c)(2), is amended so that the $8,513,000 in plant shutdown-related costs for plaintiff's Lake Charles Facility are added to the costs of all offerors other than the plaintiff.

The Clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**